

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

Signed February 5, 2014

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 11-35865-bjh-11 |
| R.E. LOANS LLC, | § | |
| R.E. FUTURE, LLC, and | § | (Chapter 11) |
| CAPITAL SALVAGE, a California | § | |
| Corporation | § | |
| | § | |
| Debtors. | § | |

_____

| | | |
|---|---|---|
| WELLS FARGO CAPITAL FINANCE, LLC | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | Adversary No. 13-3157-bjh |
| | § | |
| GORDON NOBLE, ARLENE DEA | § | |
| DEELEY, FREDRIC C. MENDES, | § | |
| NANCY RAPP, PHILLIP CANTOR, | § | |
| JOHN EMANUELE, and DAVID | § | |
| NOLAN, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION**

Before the Court is Wells Fargo Capital Finance, LLC's ("**Wells Fargo**") Motion for

Judgment on the Pleadings (the "**Motion**") [Dkt. No. 13].  By the Motion, Wells Fargo seeks to

enjoin Defendants Gordon Noble, Arlene Dea Deeley, Fredric C. Mendes, Nancy Rapp, Phillip

Cantor, John Emanuele, and David Nolan (collectively, the "**REL Class Plaintiffs**") from

> (1) pursuing, obtaining, enforcing, or collecting any judgment against Wells Fargo based on any
> measure of relief sought in the Third Amended Complaint other than the difference in value, as of
> November 2007, between the junior secured notes that the REL Class Plaintiffs received as a
> result of the Exchange Offering and the consideration that REL Class Plaintiffs gave for those
> junior secured notes in connection with the Exchange Offering; (2) continuing to prosecute any
> claims or causes of action asserted in the Third Amended Complaint that depend on assertions of
> implicit or explicit harm suffered by REL after the Exchange Offering and for which REL could
> have brought a claim as of the date REL filed its petition for bankruptcy protection; and (3)
> recovering against Wells Fargo for, or enforcing or collecting under any judgment purporting to
> award recovery for, harm implicitly or explicitly suffered by REL after the Exchange Offering and
> for which REL could have brought a claim.[1]

Motion at 2-3.  Wells Fargo contends that the recovery of these damages by the REL Class

Plaintiffs would conflict with the terms of the confirmed plan of reorganization for R.E. Loans,

LLC ("**REL**"), which released Wells Fargo from any claims that REL owned against it.

Not surprisingly, the REL Class Plaintiffs oppose the Motion, contending that the claims

pled in the Third Consolidated and Amended Complaint (the "**TAC**") filed in the Superior Court

of California, County of Alameda (the "**California Class Action**") against, as relevant here,

Wells Fargo, are direct claims which they own and are entitled to assert against Wells Fargo

notwithstanding the REL plan's release of REL's claims against Wells Fargo.  In short, this

Court has been asked to decide if "the allegations and causes of action in the [TAC] constitute

property of the estate of [REL]."  Stipulation Regarding Filing of Third Consolidated and

Amended Complaint ¶ 4.c.  [First AP Dkt.[2] No. 83-1].

---

[1] Wells Fargo also seeks a declaratory judgment that the REL Class Plaintiffs cannot do the things it then
seeks to enjoin them from doing.

[2] "First AP Dkt. No." refers to the docket in *Wells Fargo Capital Finance, LLC v. Noble*, No. 11-3618,
which was filed in the Bankruptcy Court for the Northern District of Texas on November 28, 2011.

The Motion was heard on January 22, 2014.  This Memorandum Opinion contains the Court's conclusions of law with respect to the Motion.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

This adversary proceeding has a somewhat complicated factual and procedural history.  To put the fundamental legal dispute raised by the Motion into context, the Court will start with certain background facts.[3]

REL was formed in 2002 to make real estate loans to developers in California.  REL funded these loans through monies obtained from investors, including the REL Class Plaintiffs.  Investors in REL became members of that limited liability company in return for their investments.  REL apparently prospered for a few years.  In fact, by the end of 2006, REL had raised nearly $700 million from more than 1,400 investors/members.

According to the REL Class Plaintiffs, REL's ability to raise investor capital "screeched to a halt in the spring of 2007 when, unbeknownst to the Members, [REL] was told it had been raising the funds from investors in violation of the California and federal securities statutes for many years." TAC ¶7.  "With no ability to continue raising new money from investors, [REL] faced a cash liquidity crisis . . . ." *Id*. ¶ 9.  "Rather than disclose the problems to the Members," REL is alleged to have turned to another law firm, Greenberg Traurig, LLP, ("**Greenberg**") for "a solution to their securities violations and cash liquidity problems." *Id*. ¶ 11.  Greenberg "masterminded an 'exchange offering' designed to transform the Members from equity members in [REL] into noteholders." *Id*. ¶ 11.  Then, according to the REL Class Plaintiffs, "Greenberg and the [REL] Managers prepared and disseminated false and misleading offering documents for the exchange transaction that misrepresented [REL's] financial condition, misrepresented and

---

[3] While some of the facts set out in this section of the opinion are undisputed, many are taken from the TAC.  The Court recognizes that many of these allegations will be contested in the California Class Action.  The Court is not making factual findings here, but is simply trying to put the legal dispute into context.

omitted material facts concerning [REL's] securities violations and misrepresented the nature of the exchange offering and its ramifications for the Members." *Id*.

According to the REL Class Plaintiffs, "[i]n furtherance of the scheme, Greenberg also masterminded the formation of [Mortgage Fund '08, LLC ("**MF08**")] as a feeder fund to raise and funnel new investor funds to [REL], since [REL] was itself prohibited from raising new investor funds without disclosing its past securities violations." *Id*. ¶ 12. But, the "scheme required an immediate infusion of cash . . . to maintain the false appearance of [REL's] financial stability while the exchange offering was conducted . . . ." *Id*. ¶ 13. "In furtherance of the scheme," Greenberg is alleged to have brought in Wells Fargo "to provide the third-party financing necessary to give [REL] the appearance of financial stability long enough for the [REL] Managers to consummate the exchange offering and establish MF08 as a secret funding source for [REL]." *Id*. Wells Fargo is alleged to have known about REL's securities violations and precarious financial condition, and that Greenberg had devised the exchange offering as a means to "sanitize the securities violations." *Id*. Wells Fargo is alleged to have knowingly participated in the fraudulent scheme, "materially assisting [REL's] continuing securities violations . . . ." *Id*.

According to the REL Class Plaintiffs, "[t]he exchange transaction and the related MF08 offering allowed the [REL] Managers to sustain the fraud for a prolonged period of time, but – as in all Ponzi schemes – collapse was inevitable." *Id*. ¶ 15. It is undisputed that REL defaulted on the Wells Fargo line of credit loan in September of 2008, and then defaulted on the promissory notes issued to its former members in the exchange offering. MF08 also defaulted on its obligations to its noteholders. Thereafter, REL, MF08, and certain of their managers and

affiliates filed for bankruptcy protection in Texas (REL) and California (everyone else). REL's Chapter 11 petition was filed in this Court on September 13, 2011.

The financial collapse of REL and MF08 prompted regulatory and criminal investigations of those companies and their respective managers. Specifically, on February 28, 2013, the Securities Exchange Commission brought a civil enforcement action against various managers of REL and MF08 in the United States District Court for the Northern District of California, which the SEC characterizes as a "multi-million dollar securities fraud perpetrated on investors." Complaint at 1, *SEC v. Ng*, No. 13-0895 (N.D. Ca. Feb. 28, 2013), ECF No. 1.

After numerous twists and turns in its Chapter 11 case here, REL ultimately succeeded in confirming a consensual Chapter 11 plan of reorganization. Specifically, on June 26, 2012, this Court entered its *Findings of Fact, Conclusions of Law, and Order Confirming Debtors' Modified Fourth Amended Joint[4] Chapter 11 Plan of Reorganization, Dated June 1, 2012* (the "**Confirmation Order**") [Bankr. Dkt.[5] No. 967]. Under the terms of the *Modified Fourth Amended Chapter 11 Plan of Reorganization of R.E. Loans, LLC, R.E. Future, LLC, and Capital Salvage, a California corporation* (the "**Plan**") [Bankr. Dkt. No. 905], Wells Fargo received the "**Wells Fargo Release**," as that term was defined in Article II, § 2.1 of the Plan. The Wells Fargo Release is a broad release of, in summary, any and all claims that "the Debtors, their Estates, the Reorganized Debtors, and any Person seeking to exercise the rights of the Debtors," held against Wells Fargo "based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date, relating in any way to the Debtors, the Reorganized Debtors, the Debtors' Estates, the Cases, or the Plan . . . ." Plan at 18.

---

[4] Although of no real consequence to this decision, two REL affiliates, R.E. Future, LLC and Capital Salvage, a California corporation, also filed their Chapter 11 cases in this Court, which cases were jointly administered with REL's case. All three debtors proposed the plan confirmed by the Confirmation Order.

[5] "Bankr. Dkt. No." refers to the docket in *In re R.E. Loans, LLC*, No. 11-38565, which was filed in the Bankruptcy Court for the Northern District of Texas on September 13, 2011.

With these general background facts in mind, the Court will turn to facts (procedural and otherwise) relevant to the litigation between the REL Class Plaintiffs and Wells Fargo. Specifically, in September 2011, the REL Class Plaintiffs filed the California Class Action against various parties, including Well Fargo, arising out of their investment with REL.   On November 28, 2011, Wells Fargo initiated an adversary proceeding (the "**First AP**") in this Court seeking a declaratory judgment and temporary injunction against the REL Class Plaintiffs. In summary, Wells Fargo alleged in the First AP that the claims asserted by the REL Class Plaintiffs against it in the Amended and Consolidated Complaint on file in the California Class Action (the "**Amended and Consolidated Complaint**") were property of the REL bankruptcy estate and that the REL Class Plaintiffs lacked standing to assert those claims.

On January 30, 2012, Wells Fargo filed its *Amended Motion to Stay Class Action Claims Against Wells Fargo Capital Finance, LLC and for Issuance of a Temporary Injunction* [First AP Dkt. No. 12], which was heard by the Court on April 23, 2012.   In an oral ruling announced on the record on May 2, 2012, this Court denied Wells Fargo's stay motion and requested injunction, concluding that the claims asserted by the REL Class Plaintiffs in the Amended and Consolidated Complaint were not property of REL's bankruptcy estate and were not stayed by § 362 of the Bankruptcy Code.   An order consistent with this oral ruling was entered on May 11, 2012 [First AP Dkt. No. 54], and a judgment dismissing the First AP was entered on May 17, 2012 [First AP Dkt. No. 56].

Wells Fargo appealed.   After briefing and oral argument, on March 28, 2013, the District Court issued a written opinion (the "**Opinion**") in which it concluded that the claims asserted by the REL Class Plaintiffs in the Amended and Consolidated Complaint were property of the REL bankruptcy estate in part, and were not property of the REL bankruptcy estate in part.

Accordingly, the District Court affirmed in part, and reversed and remanded in part, this Court's Order and Judgment.

As just noted, the issue on appeal to the District Court was whether the REL Class Plaintiffs' claims against Wells Fargo as pled in the Amended and Consolidated Complaint were property of the REL bankruptcy estate. The District Court first considered whether the REL Class Plaintiffs' claim for aiding and abetting breach of fiduciary duties was property of the REL bankruptcy estate. Wells Fargo argued that the REL Class Plaintiffs alleged two separate harms: (i) harms based on the credit facility that Wells Fargo provided to REL, which encumbered all of REL's assets; and (ii) harms based on an exchange offering (hereinafter, the "**Exchange Offering**" or "**Exchange Offer**") pursuant to which the REL Class Plaintiffs exchanged their membership interests in REL for junior secured notes[6] equal to the par value of the REL Class Plaintiffs' former membership interests. The District Court separately analyzed both harms and concluded that the claims arising out of the line of credit transaction belonged to REL's bankruptcy estate. According to the District Court's analysis, REL was harmed when its assets were encumbered, and the REL Class Plaintiffs' injury was derivative of that injury. However, the District Court concluded that the claims based on the Exchange Offering were not property of the REL bankruptcy estate because the REL Class Plaintiffs suffered direct harm.

The District Court next considered whether the REL Class Plaintiffs' claim for secondary liability for securities fraud as pled in the Amended and Consolidated Complaint was property of the REL bankruptcy estate. The District Court concluded that the REL Class Plaintiffs alleged a direct injury as their claim was based on the Exchange Offering made to them, and they were injured directly by that offering.

---

[6] Wells Fargo had already been granted a first lien on REL's assets, so the lien granted to the former members in the Exchange Offering to secure the notes was junior to the Wells Fargo lien.

The District Court finally considered the REL Class Plaintiffs' unfair competition law claim as pled in the Amended and Consolidated Complaint, concluding that any unfair competition law claim based on the line of credit Wells Fargo provided to REL was property of the REL bankruptcy estate.  However, according to the District Court's analysis, any unfair competition law claim based on the Exchange Offering belonged to the REL Class Plaintiffs and was not property of the REL bankruptcy estate.

Wells Fargo appealed the District Court's decision to the Fifth Circuit Court of Appeals. That appeal remains pending, although the REL Class Plaintiffs filed a motion to dismiss the appeal due to the agreed filing of a new complaint in the California Class Action – *i.e.*, the TAC – which, according the REL Class Plaintiffs, moots the appeal, since the Amended and Consolidated Complaint is no longer the live pleading in the California Class Action.  Although oral argument on the appeal was scheduled for February 6, 2014, by letter dated January 17, 2014, the Circuit Court cancelled the argument and the case will be disposed of based upon the parties' written submissions.

Notwithstanding the pendency of the appeal, on May 5, 2013, the REL Class Plaintiffs and Wells Fargo filed a stipulation in the California Class Action in which they agreed that: (i) the TAC would be filed (without prejudice to any party's right to pursue objections to the substance of that pleading), and (ii) all issues relating to the REL Class Plaintiffs' compliance with the Opinion and whether the allegations and causes of action pled in the TAC constitute property of the REL bankruptcy estate would be submitted to this Court (or such appellate court as may hold requisite jurisdiction) for determination.  Accordingly, on June 3, 2013, the REL Class Plaintiffs filed the TAC in the California Class Action against Greenberg and Wells Fargo. And, on July 26, 2013, Wells Fargo filed the above adversary proceeding (the "**Second AP**")

seeking the determinations that the parties had agreed would be sought here once the TAC was filed in the California Class Action.  Thereafter, Wells Fargo filed the Motion, which is ripe for this Court's decision, having been fully briefed and argued by the parties.

## II.    LEGAL ANALYSIS

### a.  Relevant Standard for Deciding the Motion

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  Judgment on the pleadings is only appropriate when there are only questions of law and no disputed issues of fact.  *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 420 (5th Cir. 2001).  A court decides a motion under Rule 12(c) using the same standard it would use to decide a motion to dismiss under Rule 12(b)(6).  *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007).

The issue for this Court to decide, then, is whether Wells Fargo's complaint in the Second AP states a valid claim.  *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.2d 425, 440 n.8 (5th Cir. 2000).  The Court will construe the complaint in the light most favorable to Wells Fargo, *id.*, accepting all of its factual allegations as true.  *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008).  In deciding the Motion, the Court must also determine whether the complaint pled enough facts to state a plausible claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (U.S. 2007).  The Court is confined to the pleadings in determining whether the Motion should be granted.  *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

### b.  As Applied Here

#### i.  Does the TAC Comply with the Opinion?

This question is easily answered in the affirmative.  As noted previously, the District Court concluded that the three claims pled in the Consolidated and Amended Complaint – *i.e.*, (i) aiding and abetting breach of fiduciary duties; (ii) secondary liability for securities fraud; and (iii) unfair competition law – at least to the extent those claims were based on the Wells Fargo line of credit loan transaction, constituted property of the REL bankruptcy estate and the REL Class Plaintiffs lacked standing to bring those claims.  However, the District Court also concluded that to the extent those three claims were based on the Exchange Offering, the REL Class Plaintiffs owned the claims and the claims were not property of the REL bankruptcy estate.

There is no claim asserted in the TAC based on the Wells Fargo line of credit loan transaction.  When the REL Class Plaintiffs amended their complaint, they dropped those three claims consistent with the Opinion's conclusions.  The only claims pled against Wells Fargo in the TAC are (i) aiding and abetting breach of fiduciary duty based upon the Exchange Offer; (ii) secondary liability for securities fraud based upon the Exchange Offer; and (iii) an unfair competition law claim based upon the Exchange Offer.  This is fully consistent with what the District Court ruled the REL Class Plaintiffs were entitled to assert against Wells Fargo in the Opinion.

However, Wells Fargo remains unsatisfied – largely it seems with the District Court's refusal in the First AP to fully adopt its position on the Exchange Offer-based claims – and has returned to this Court now that the TAC is on file to seek the determination that at least certain *damages* being sought on the Exchange Offer-based claims are derivative of damages that belong to the REL bankruptcy estate and the REL Class Plaintiffs cannot recover those damages given the Wells Fargo Release in the Plan.

In addressing Wells Fargo's arguably new, but certainly more nuanced, argument here, we will first decide whether it is possible that damages on individually owned claims can actually be damages that derive from damage to the bankruptcy debtor (here, REL) such that the individuals (here, the REL Class Plaintiffs) are precluded from recovering those damages. Assuming that contention is legally sound, we will analyze the damages available to the REL Class Plaintiffs on the claims pled in the TAC to see if they are improperly attempting to recover damages that belong to the REL bankruptcy estate and were released under the Plan.

### ii. Can Damages on Direct Claims Be Derivative such that the Owner of the Claim cannot Recover Them?

As noted previously, Well Fargo requests in the Motion that this Court declare that (1) "the REL Class Plaintiffs have, at most, a personal claim against Wells Fargo for any difference in value, in November 2007, between the equity interests the REL Class Plaintiffs gave REL, and the debt instruments REL gave the REL Class Plaintiffs" in the Exchange Offering, and (2) "all other claims the REL Class Plaintiffs assert against Wells Fargo . . . were property of the REL estate as of the effective date of the REL Plan, and were therefore released as against Wells Fargo under the REL Plan and the REL Confirmation Order." Motion at 2. As the argument progresses in its initial brief, and becomes even more crisply articulated in its reply brief (the "**Reply**"), however, what Wells Fargo is really asking this Court to do is "delineate" (divide) the damages sought by the REL Class Plaintiffs on each cause of action pled against Wells Fargo in the TAC into: (i) those damages that would provide "a recovery that is purely personal to the REL Class Plaintiffs," and (ii) those damages that provide a "derivative recovery for injury to REL itself that would impinge upon claims against Wells Fargo released under the REL Plan and REL Confirmation Order." Reply at 2.

In their opposition to the Motion (the "**Opposition**"), the REL Class Plaintiffs argue that (i) all of their claims against Wells Fargo are personal or direct (as the District Court concluded in the Opinion), and (ii) they are simply seeking the measure of damages available to them under California law.  Opposition at 1-2.

At the outset, this Court notes that Wells Fargo essentially concedes that the claims pled against it in the TAC are direct claims owned by the REL Class Plaintiffs.  But, to be clear, if Wells Fargo is not making this concession, this Court concludes that the three claims pled against Wells Fargo in the TAC that arise from the Exchange Offering – (i) aiding and abetting breach of fiduciary duty; (ii) secondary liability for securities fraud; and (iii) unfair competition law – are claims that belong to the REL Class Plaintiffs and not the REL bankruptcy estate.  The Court agrees with the REL Class Plaintiffs, these claims are clearly inducement claims, which California courts and the Fifth Circuit have consistently held are direct, not derivative, claims. *See, e.g.*, *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 856 (5th Cir. 2008); *Schertz-Cibolo-Universal City Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1285-86 (5th Cir. 1994); *Sutter v. Gen. Petroleum Corp.*, 170 P.2d 898, 899-900 *Denevi v. LGCC*, 18 Cal. Rptr. 3d 276, 281-82 (Cal. Ct. App. 2004); *Vega v. Jones, Day, Reavis & Pogue*, 17 Cal. Rptr. 3d 26, 37 (Cal. Ct. App. 2004)  That these claims are owned by (or in Wells Fargo's nomenclature, are personal to) the REL Class Plaintiffs seems indisputable, as they are the individuals to whom REL made the Exchange Offer.  REL could not possibly own these claims as it was the offeror, not the recipient of the offer, and it suffered no damage from having made the offer to its former members.  In other words, on the date it filed its bankruptcy petition,

REL could not have brought these claims. In coming to this conclusion,[7] the Court adopts the legal standard for determining if a claim is property of the estate articulated by the District Court in sections II and III of its Opinion in the First AP.[8]

However, this conclusion does not end our analysis, as Wells Fargo now makes the more nuanced argument that the REL Class Plaintiffs are attempting to recover *damages* that are derivative of damages REL suffered on claims that REL could have brought on its bankruptcy petition date.[9] Thus, according to Wells Fargo, we must enjoin the REL Class Plaintiffs from attempting to collect these derivative damages in violation of the Wells Fargo Release in the Plan.

The principal case upon which Wells Fargo relies is *In re NC12, Inc.*, 478 B.R. 820 (Bankr. S.D. Tex. 2012). In that case, shareholders of NC12, Inc. filed a state court lawsuit against NC12's former directors and officers. *Id.* at 825. The plaintiff-shareholders sued for breach of fiduciary duty. *Id.* Another group of shareholders intervened, and the intervenors brought causes of action for breach of fiduciary duty, shareholder oppression, securities fraud, and conspiracy. *Id.* The court concluded that all of the claims were property of the NC12 bankruptcy estate, except for the intervenors' securities fraud claim. *Id.* at 841.

The *NC12* court began its analysis with the question of whether NC12 could have raised the claims that the shareholders were raising when NC12 filed for bankruptcy. *Id.* at 832. As

---

[7] This conclusion is consistent with the District Court's conclusions in the Opinion based upon the allegations contained in the Consolidated and Amended Complaint then on file in the California Class Action, which, as relevant here, are not materially different than the allegations contained in the TAC.

[8] On appeal to the Fifth Circuit, Wells Fargo agreed that "the District Court's opinion thoroughly articulates the correct standard" for determining whether the causes of action pled were property of the REL bankruptcy estate. Appellants Brief at 15, *Wells Fargo Capital Fin. LLC v. Noble (In re R.E. Loans, LLC)*, No. 13-10468 (5th Cir. July 1, 2013).

[9] While Wells Fargo failed to identify initially what injury to REL was being impinged upon by the REL Class Plaintiffs in the TAC, it comes close to revealing the nature of the claim in its Reply as noted *infra* at p. 19. It appears that Wells Fargo believes the damages being sought by the REL Class Plaintiffs in the TAC impinge upon damages REL could recover itself based upon the managers' breaches of fiduciary duty owed to REL. The Court ultimately disagrees, for the reasons stated later in this Memorandum Opinion. *See infra* at pp. 19-28.

for the intervenors' claim for shareholder oppression, the intervenors' claimed that they were oppressed when the defendants: (i) took control of the corporation and stripped its assets; (ii) removed directors who were trusted by the shareholders; and (iii) thwarted attempts to investigate NC12's accounting practices. *Id.* at 834. While the court recognized that the intervenors could have sought damages for the violation of their shareholder rights, they could not seek damages based on harm to NC12:

> The Intervenors may seek damages for the violation of their shareholder rights, but only for damages not derivative of damages to the corporation; they may not seek damages for dilution of corporate value due to the alleged stripping or misappropriation of corporate assets. Any claim for damages due to stripping or misappropriate of corporate assets belongs to the estate and may be asserted only by the Trustee.

*Id.* at 835. After reviewing the allegations contained in the petition, the court concluded that any harm the intervenors allegedly suffered was derivative of harm suffered by NC12. *Id.*

Similarly, the *NC12* court concluded that the shareholders did not have a direct claim for breach of fiduciary duty (or conspiracy to commit breach of fiduciary duty). The court found the shareholders' allegations to be "generalized allegations of mismanagement" and any harm as a result of the defendants' alleged stripping of corporate assets was felt by NC12 in the first instance. *Id.*

However, the *NC12* court concluded that the intervenors' securities fraud claim (and related aiding and abetting claim) was a direct claim that was not property of the NC12 bankruptcy estate. *Id.* According to the court's analysis, the intervenors had a direct claim for the difference in price they paid for shares in reliance on the defendants' alleged misrepresentations and the actual value of NC12's shares at the time of their investment. *Id.* at 837. The court also stated that "[t]he Intervenors may not recover damages for the difference in the price they paid for the shares and what the shares would have been worth if not for the alleged post-purchase misconduct in the operation of the corporation." *Id.* In a footnote, the

*NC12* court clarified that it was "not rul[ing] on the appropriate measure of damages for the Intervenors' fraud claims." *Id.* at 837 n.1. Instead, according to the court, its ruling regarding recoverable damages related "solely to the issue of which injuries give rise to claims belonging to the Intervenors." *Id.*

Wells Fargo also relies on an opinion by the *NC12* court in another case, *West v. Peterson (In re Noram Resources, Inc.)*, No. 11-3598, 2012 WL 2571154 (Bankr. S.D. Tex. July 2, 2012). In that case, the trustee for the bankruptcy estates of Ausam Energy Corp. and Noram Resources, Inc. (collectively, the "Debtors") brought an action against shareholders (who also held additional warrants) of the Debtors for turnover of property and damages resulting from violation of the automatic stay. *Id.* at *1. The shareholders had filed state court lawsuits against former directors of the Debtors for negligence and negligent misrepresentation. *Id.* Two of the shareholders had settled their state court claims and the remaining shareholders were continuing to pursue their claims in state court. *Id.* In his action before the bankruptcy court, the trustee argued that because the shareholders' claims were property of the estate, the shareholders who had settled should turn over the settlement proceeds and the shareholders who were still pursuing their claims should be enjoined from doing so. *Id.*

The issue before the *Noram* court was whether the shareholders' claims for negligence and negligent misrepresentation were property of the Debtors' estates. The court concluded that they were property of the estates in part. *Id.* at *4 Specifically, the shareholders' claim for negligence was a derivative claim belonging to the bankruptcy estate because the former shareholders' damages derived from the Debtors' damages. *Id.* at *5. In coming to its conclusion, the court stated:

[T]he Defendants' claim for negligence does not merely overlap with Ausam's [(one of the Debtors)] claim for damages caused by the breach of the Debenture; the Defendants' alleged damages from the breach are entirely derived from Ausam's damages. If Ausam had not been harmed as a result of the breach, the Defendants would not have been harmed.

*Id*. at *6.

The *Noram* court also concluded that the shareholders' negligent misrepresentation claim based on harm they suffered as a result of the Debtors' former directors' failure to disclose Ausam's financial condition was owned by the shareholders, as the Debtors "could not have brought claims for negligent misrepresentation to the Defendants as of the petition date." *Id*. However, according to the court, "[t]he Defendants' damage calculation must . . . exclude consideration of the reduction in value [of the shares] caused by the breach of the Debenture." *Id*. Or, stated another way,

[T]he Defendants' recovery is limited to damages caused *only* by the negligent misrepresentation, independent of damages caused by the default that was precipitated by the issuance of the Subscription shares. In other words, the value of what the Defendants received in the Subscription will be, for damages purposes, the value the shares would have had if the issuance of the Subscription did not violate the Debenture. The Defendants, as creditors of Ausam, will recover for damages to Ausam, if at all, through the estate.

*Id*. at *7.

Of note, while the shareholders argued that they were seeking damages based solely on the misrepresentations made by the directors and officers to them, the court concluded that their pleadings alleged post-misrepresentation mismanagement:

Despite the Defendants' disclaimer, the Defendants' state court pleadings tell another story. . . . The Defendants allege not only that the Directors misrepresented Ausam's financial condition and/or withheld financial information, but also that the Directors were negligent in consummating the Subscription, knowing that the issuance of Subscription shares and warrants would cause a default in the Debenture.

*Id*. According to the court, this claim for damages to Ausam was property of the estate and could only be asserted by the bankruptcy trustee. *Id.*

In another case relied upon by Wells Fargo, *Grove Farm Fish & Poi, LLC v. Carte (In re Grove Farm Fish & Poi, LLC)*, No. 90031, 2011 WL 3878358 (Bankr. D. Haw. Aug. 31, 2011),

the issue before the court was whether certain causes of action asserted by a minority member against the majority member and/or certain of the debtor's managers were direct or derivative claims. *Id.* at *1. One of the claims was a claim that the majority member had breached an investor agreement into which the two members had entered. *Id.* at *2. The court concluded that any claims alleging breach of an agreement to which the minority shareholder was a party were his direct claims. *Id.* However, the court also noted that the same alleged conduct might give the debtor its own claims, concluding that the minority member, "therefore, is entitled to recover on his direct claims for breach of the [investor agreement] any losses that he suffered apart from any diminution in the value of his interest in the company." *Id.* The court also concluded that the minority member's claims for denial of voting and participation rights were direct claims, but again limited damages to those suffered by the minority member apart from any diminution in the value of his interest in the company. *Id.* at *3. Claims for misrepresentation to the minority member were held direct in part; but again, the minority member could only recover damages to the extent they compensated him for his damages apart from any diminution in value of his interest in the corporation. *Id.* Other claims asserted by the minority member were similarly parsed by the court and, with respect to any other claims found to be direct, the court limited the minority member's recovery to any loss he suffered "apart from any diminution in the value of his membership interest." *Id.*

In the final case relied upon by Wells Fargo, *Weidberg v. Barnet*, 752 F. Supp. 2d 301, 303 (E.D.N.Y. 2010) the plaintiff was the co-owner of a bicycle company. He sued the other co-owner and the company's chief financial officer asserting four causes of action: (i) breach of fiduciary duty; (ii) aiding and abetting breach of fiduciary duty; (iii) fraudulent inducement; and (iv) breach of contact. *Id.* at 304-05. Once again, the issue before the court with respect to three

of those claims – *i.e.*, breach of fiduciary duty, aiding and abetting a breach of fiduciary duty and breach of contract – was whether the plaintiff alleged direct claims, or whether his claims were derivative of claims that the bicycle company could have brought when it filed its bankruptcy petition. *Id.* at 306-07.

The court concluded that the plaintiff's claim for breach of fiduciary duty based on allegations that the defendants looted the company properly belonged to the company. *Id.* at 308. The alleged acts harmed the company by decreasing its value, and the plaintiff's harm was derivative of the company's harm. *Id.* Thus, according to the court, the claim belonged to the bankruptcy estate. *See id.* at 306-07. While the court concluded that the plaintiff could have had a direct claim for breach of fiduciary duty based on the defendants' alleged failure to truthfully represent the company's financial condition to him, the court ultimately concluded that the plaintiff "expresses a theory of damages that is derivative. He alleges that the defendants' misstatement of the value of the [company] caused the plaintiff 'to suffer damages from the diminution of the value of his company in the amount of $5 million.'" *Id.* at 308. Because harm that a plaintiff suffers due to a diminution of value in his ownership interest of an entity is indirect harm, it is a derivative claim belonging to the bankruptcy estate.[10] *Id.* Similarly, the court concluded that the plaintiff's aiding and abetting breach of fiduciary duty claim was a derivative claim. *Id.*

While the court concluded that the plaintiff could have held a breach of contract claim since he was a party to the contract that was allegedly breached, based upon the allegations in the complaint, the alleged duty breached was owed to the company and not to the plaintiff. *Id.* at 309. Thus, any harm suffered by the plaintiff as a result of the breach was derivative of the harm to the company and the claim belonged to the company. *Id.*

---

[10] The court granted the plaintiff leave to amend this claim to see if he could allege direct damages. *Id.*

So, while these cases clearly stand for the unremarkable proposition that the nature of the injury and the harm or damage suffered must be considered when deciding whether the cause of action is direct or derivative, the flaw in Wells Fargo's analysis is revealed in its Reply when it identifies the harm or injury it believes the REL Class Plaintiffs' sue to remedy. First, Wells Fargo posits that the TAC contains allegations that "after the Exchange Offering, the Managers engaged in misconduct and mismanagement that ultimately drove REL into bankruptcy and ultimately rendered the Class Plaintiffs' investments worthless." Reply at 8. Then, according to Wells Fargo, none of these "numerous 'general allegations of mismanagement' or 'alleged breaches of fiduciary duty involve any alleged injury directly to the' investors-turned-noteholders." *Id.* at 8-9; *cf. In re NC12*., 478 B.R. at 836. Finally, Wells Fargo argues that the REL Class Plaintiffs' "'allegations pertain to injuries to' REL because they concern 'stripp[ing] [REL] of assets to the detriment of [its] creditors' and could be remedied in a breach of fiduciary action against the Managers." Reply at 9 (alteration in original) (citing *In re NC12*, 478 B.R. at 836).

The flaw in Wells Fargo's argument is that it is predicated upon a false premise.[11] While the TAC does contain allegations about post-Exchange Offer mismanagement of REL by its managers, and certainly some of the allegations in the TAC could be characterized as "general allegations of mismanagement" by the REL managers, the REL Class Plaintiffs do not seek to

---

[11] This flaw in Wells Fargo's argument is similar to a flaw in its analysis identified by the District Court in the First AP. There the District Court noted:

> Wells Fargo maintains that the Class Plaintiffs must be alleging harm that is derivative to REL because their theory of liability is, and must be, that they suffered injury from the Exchange Offering by losing the right to control REL and thus to prevent the alleged mismanagement and mishandling of money that ultimately led to REL's bankruptcy. Wells Fargo argues that the theme of injury through loss of the right of control animates the Class Plaintiffs' allegations, and that they suffered no other potentially cognizable injury from the Exchange Offering. The court disagrees.
> The consolidated complaint contains extensive allegations that the Class Plaintiffs were misled into exchanging their equity interests in REL for promissory notes. The allegations of injury are of direct harm to the Class Plaintiffs, not explicitly or implicitly of harm to REL that injured the Class Plaintiffs derivatively or indirectly.

*Wells Fargo Capital Fin., LLC v. Noble (In re R.E. Loans, LLC)*, No. 12-3513, 2012 WL 1265205 (N.D. Tex. March 20, 2013).

recover damages for the stripping of REL assets; nor do they seek to assert a claim for breach of the managers' fiduciary duties to REL.[12] In short, in relying on these allegations, Wells Fargo mischaracterizes the thrust of the TAC[13] and the gravamen of the injuries of which the REL Class Plaintiffs complain. The REL Class Plaintiffs could eliminate those allegations from the TAC entirely, as they add nothing to the claims for which they sue Wells Fargo.

To demonstrate this point, we turn to a brief analysis of each of the claims pled in the TAC and whether the alleged harm is personal to the REL Class Plaintiffs – *i.e.*, do they allege an injury to themselves or is their injury derived from harm to the debtor? In doing so, we keep in mind the Fifth Circuit's admonition in *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 587 (5th Cir. 2008), that the fact that the bankruptcy estate may have claims for its own direct

---

[12] In fact, the REL Class Plaintiffs specifically disclaim any intention to assert such a claim in both the TAC and the Opposition. TAC ¶ 24; Opposition at 9.

[13] In pleading their aiding and abetting breach of fiduciary duty and secondary liability for security fraud claims, the REL Class Plaintiffs incorporate various paragraphs of factual allegations in the TAC into those claims. Specifically, in ¶ 307 (which pleads the aiding and abetting claim) and ¶ 317 (which pleads the security fraud claim), the REL Class Plaintiffs incorporate ¶¶ 79-156, 176-184, and 185-205 of the TAC into those claims. Paragraphs 79-84 contain allegations concerning the development of the scheme to exchange the membership interests for notes; ¶¶ 85-100 contain allegations concerning Wells Fargo's awareness of REL's securities law violations and its alleged help in structuring its loan so as to avoid disclosing REL's securities law violations to the REL members; ¶¶ 101-116 contain allegations concerning how the members were deceived in connection with the Exchange Offering; ¶¶ 117-134 contain allegations concerning how MF08 was established as a "Ponzi" feeder fund allegedly in furtherance of the fraudulent scheme, how the MF08 investors were fraudulently induced to invest with MF08 pursuant to an offering memorandum that contained material misrepresentations, and how the managers *of MF08* misappropriated funds of MF08 and transferred them to REL; and ¶¶ 135-156 contain allegations concerning how the managers *of MF08* fraudulently diverted MF08 funds to REL in violation of the MF08 offering memorandum and how an alleged "sham after-the-fact loan sale transaction" was concocted to attempt to legitimize the diversion of MF08 funds into REL. Similarly, ¶¶ 176-184 contain allegations of how Wells Fargo specifically assisted the REL managers' breaches of fiduciary duties and their sale of securities through false and misleading representations and omissions in connection with the Exchange Offer (and the MF08 offering). Paragraphs 185-189 contain allegations about how the investors – not REL (or MF08) – were harmed by the "scheme hatched by Greenberg and the Managers and perpetrated with the knowing and active assistance of Wells Fargo . . . .," TAC ¶ 185, while ¶¶ 190-191 allege that if Greenberg and Wells Fargo had not participated in the scheme, the State of California regulators would have stopped REL from continuing to sell securities in violation of state securities laws. Finally, ¶¶ 192-205 contain allegations supporting the REL Class Plaintiffs' contention that their claims are not barred by the statute of limitations through the application of the discovery rule or the fraudulent concealment doctrine.

So from the Court's perspective, Wells Fargo mischaracterizes the thrust of the relevant allegations in the TAC. As the Court reads the TAC, none of these allegations relate to post-Exchange Offer mismanagement of REL, the stripping of REL's assets by its managers, or similar claims that would give rise to a claim that belongs to the REL bankruptcy estate.

injuries that it could have brought as of the commencement of the case does not mean that the creditor's claims are merely derivative of the debtor's.

### iii.  Aiding and Abetting Breach of Fiduciary Duty

In the TAC, the REL Class Plaintiffs allege that Wells Fargo aided and abetted the REL managers' breach of the fiduciary duty to make full, accurate and truthful disclosures to the members at the time the managers solicited the members' participation in the Exchange Offering. TAC ¶¶ 301-10 (and paragraphs referenced therein). According to the REL Class Plaintiffs, "[t]his is a duty of truthfulness that runs directly to the investors as members of . . . REL." Opposition at 16.  And, according to the REL Class Plaintiffs, the "harm from the alleged breach is that the REL investors were wrongfully induced to enter into the Exchange Offering – a harm in no way suffered by REL as the offeror of the securities." *Id*.  Finally, the REL Class Plaintiffs contend that the applicable remedy for breach of fiduciary duty "is keyed to the expectancy harm suffered by the REL investor," and that they are entitled to recover "benefit of the bargain damages." *Id*. at 17.

The REL Class Plaintiffs appear to correctly state California law.  The statutes and cases they rely upon in their Opposition are correctly cited.  Moreover, under California law, a defendant who aids and abets an intentional tort can be held jointly liable for that tort.  *Newman v. San Joquin Delta Cmty. College Dist.*, No. 09-3441, 2010 WL 3633737 (E.D. Cal. Sept. 14, 2010).  A breach of fiduciary duty is an intentional tort under California law.  *See Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 405 (Cal. Ct. App. 2005).  In *Heckman v. Ahmanson*, 214 Cal. Rptr. 177, 183 (Cal. Ct. App. 1985), the court found that a company could be jointly liable as an aider and abettor for another company's breach of fiduciary duty where it was an active participant in the breach.

Assuming, without deciding, that Wells Fargo's actions satisfied the elements of aiding and abetting an intentional tort, Wells Fargo would be jointly liable for the damages resulting from the managers' breaches of fiduciary duty to REL's members. And, contrary to Wells Fargo's requested limitation in the Motion,[14] these damages are measured at the time the fraud is discovered, not at the time of the Exchange Offer. *Salahutdin v. Valley of Calif., Inc.*, 29 Cal. Rptr. 2d 463, 470-71 (Cal. Ct. App. 1994). ("[S]uch damages are calculated to require the faithless fiduciary to make good the 'full amount of the loss'. Applying the difference as of the date of the transaction would defeat the goal of compensation for the entire loss, where, as here, discovery of the fiduciary's constructive fraud did not occur until years after the purchase of the property.").

This cause of action – aiding and abetting the managers' breach of fiduciary duties owed to the REL Class Plaintiffs as members of REL (as contrasted with duties the managers owed to REL itself) – seeks to recover damages for the omissions of material facts or the affirmative misrepresentations of material facts made to the REL Class Plaintiffs in connection with the Exchange Offering. The allegations of injury are of direct harm to the REL Class Plaintiffs, not explicitly or implicitly of harm to REL that injured the Class Plaintiffs derivatively or indirectly. Moreover, this measure of damage does not appear to compensate the REL Class Plaintiffs for injury to REL, as REL was not injured by the Exchange Offer or by its managers' breaches of fiduciary duty to the members in connection with the Exchange Offer.

However, with this said, to the extent a component of the REL Class Plaintiffs' damages at trial includes compensation to the REL Class Plaintiffs for post-Exchange Offer

---

[14] As noted previously, Wells Fargo requests a declaration that "the REL Class Plaintiffs have, at most, a personal claim against Wells Fargo for any difference in value, in November 2007 [the date of the Exchange Offer], between the equity interests the REL Class Plaintiffs gave REL, and the debt instruments REL gave the REL Class Plaintiffs." Motion at 2.

mismanagement of REL, that component of damages must be excluded by the court presiding over the California Class Action because a claim – and the damages flowing from that claim – for post-Exchange Offer mismanagement by REL's managers belonged to REL on the date it filed for bankruptcy. And, the REL Class Plaintiffs will participate in any recovery of those damages as creditors of REL pursuant to the terms of the Plan.

While this is a bit theoretical at the moment, and will remain theoretical until the evidence at trial is known, perhaps an example will illuminate the Court's thinking. Let's assume that the REL Class Plaintiffs' measure of damages for aiding and abetting breach of fiduciary duty is, as they argue, expectancy or benefit of the bargain damages, and assume further that the reason the REL Class Plaintiffs did not receive the benefit of their bargain – *i.e.*, payment of the notes in full – is because of a combination of two things: (i) the REL managers' post-Exchange Offer mismanagement or negligence, and (ii) the collapse of the real estate market in California. If this is the evidence at trial, the court presiding over the California Class Action will be required to apportion the recoverable damages between those attributable to the REL managers' post-Exchange Offer "bad acts" for which REL could have sued on its bankruptcy petition date and those attributable to the collapse of the real estate market for which REL would have no claim. Conversely, if the evidence at trial establishes that REL's financial demise and ultimate inability to pay the notes had nothing to do with post-Exchange Offer REL manager "bad acts," but was inevitable from either the cumulative effect of the pre-Exchange Offer "bad acts" and the substantial continuing decline of the California real estate market following the Exchange Offer, or was precipitated by simply the collapse of the California real estate market following the Exchange Offer, then, from this Court's perspective, no portion of the REL Class Plaintiffs' damages should be excluded as derivative of an injury to REL.

Until the evidence at trial is closed, it is impossible to know what facts will be proven. So, from this Court's perspective, it is impossible to enjoin the REL Class Plaintiffs from pursuing their direct claim against Wells Fargo for aiding and abetting the REL managers' breach of fiduciary duty owed to them as members of REL. But, it is appropriate to enjoin the REL Class Plaintiffs from attempting to recover damages attributable to the REL managers' post-Exchange Offer mismanagement of REL.[15] We leave it to the court presiding over the California Class Action to correctly apportion those damages to the extent that becomes necessary at trial.

### iv. Secondary Liability for Securities Fraud

The REL Class Plaintiffs allege that REL made untrue statements and omitted material facts in violation of § 25401 of the California Corporations Code in connection with the Exchange Offering. TAC ¶ 315. They also allege that Wells Fargo "knowingly and substantially assisted [REL's] securities law violations," *id.* ¶ 317, making Wells Fargo secondarily liable under California law for securities fraud. *Id.* ¶¶ 311-318. The REL Class Plaintiffs further allege that the members were harmed by, among other things: (i) the loss of their right to share in profits; (ii) the loss of their voting rights to control management of the LLC; (iii) the loss of their undisclosed right to rescind their original membership investments (having been locked in through long term notes); and (iv) receipt of subordinated promissory notes that were less valuable than the membership interests forfeited in the Exchange Offering. *Id.* ¶ 112; Opposition at 13. Moreover, according to the REL Class Plaintiffs, the damages for violations of sections 25401, 25501, and 25504.1 are statutorily prescribed. Opposition at 14. Specifically, the REL Class Plaintiffs argue that the measure of damages is the difference

---

[15] Given the REL Class Plaintiffs' disclaimer in ¶ 24 of the TAC – *i.e.*, "Plaintiffs expressly disclaim any intention to pursue derivative claims based on mismanagement or misappropriation by the [REL] Managers," this limited injunction should not adversely impact the REL Class Plaintiffs pursuit of their claims.

between the price at which the security was bought and the value of the security at the time they disposed of it. *Id.* Thus, according to the REL Class Plaintiffs, they are entitled to recover the difference between the price they paid for the notes – *i.e.*, the face value of the promissory notes exchanged for their membership interests – and the value of the security when they disposed of it – *i.e.*, the worthless promissory notes when "canceled" through the REL bankruptcy proceedings. *Id.*

In general, the Court agrees with the REL Class Plaintiffs. They allege that they were fraudulently induced to exchange their membership interests in REL for junior secured promissory notes and that they suffered an injury the instant they agreed to the exchange. California courts have found that when a plaintiff was defrauded, his "injury is in no sense derivative of his status as an owner-member of the resulting entity." *Denevi v. LGCC*, 18 Cal. Rptr. 3d 276, 284 (Cal. Ct. App. 2004). As the REL Class Plaintiffs correctly argue, § 25401 of the California Corporations Code prohibits persons from "[m]ak[ing] an untrue statement of material fact or omit[ting] to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading." CAL. CORP. CODE. § 25401. Under California law, an entity who "materially assists in any violation of Section . . . 25401 . . . with the intent to deceive or defraud, is jointly and severally liable with any other person liable . . . for such violation." CAL. CORP. CODE § 25504.1. Section 25501 of the California Corporations Code provides the damages available to a plaintiff who purchased securities – but no longer holds those securities – from a seller who violated § 25401:

> Damages recoverable under this section by a purchaser shall be an amount equal to the difference between (a) the price at which the security was bought plus interest at the legal rate from the date of purchase and (b) the value of the security at the time it was disposed of by the plaintiff plus the amount of any income received on the security by the plaintiff.

*Id.* § 25401.

Moreover, §§ 25401 and 25501 do not require the plaintiff to show any proof of causation or that the plaintiff relied on the untrue statement. *Bowden v. Robinson*, 136 Cal. Rptr. 871, 878 (Cal. Ct. App. 1977). Therefore, a plaintiff can recover damages, even when "the subject matter of the misrepresentation was not a factor in causing the subsequent decline in the price or value of the security purchased by the plaintiff." 1 MARSH & VOLK, PRACTICE UNDER THE CALIFORNIA SECURITIES LAWS (rev. ed. 2006) § 14.03[7]. This is consistent with the measure of damages under § 12(2) of the Securities Act of 1933. *See In re WorldCom, Inc.*, 377 B.R. 77, 91-92 (Bankr. S.D.N.Y.). California modeled Section 25501 after Section 12(2). *Id.* at 91. In *Randall v. Loftsgaarden*, 478 U.S. 647, 659 (1986), the Supreme Court noted that through § 12(2), "Congress shifted the risk of an intervening decline in value of the security to defendants, whether or not that decline was actually caused by the fraud."

Assuming, without deciding, that REL did make untrue statements of material fact or omitted material facts in connection with the Exchange Offering, it violated § 25401 of the California Corporations Code. Also assuming, without deciding, that Wells Fargo knowingly and materially assisted in REL's violation, Wells Fargo is jointly and severally liable for the REL Class Plaintiffs' damages. While the court presiding over the California Class Action may quibble with the REL Class Plaintiffs' contention that the face amount of the note is the "price at which the security was bought," given the fact that a membership interest was exchanged for the note and the court may have to value that membership interest at the time of the exchange, this Court is satisfied that the REL Class Plaintiffs are not attempting to recover for harm to REL itself.

Moreover, even if the value of the REL Class Plaintiffs' notes may have been reduced due to post-Exchange Offer mismanagement of REL (as Wells Fargo contends), *Marsh's California Corporate Law*, § 15.11 supports that the claim is still a direct one:

> [E]ven though the plaintiff's loss may have resulted from his purchase of stock of a corporation that became worthless, *if the basis of his cause of action is fraudulent representations made directly to him by the defendants, then he can bring an individual action based upon such fraud against those who committed it. The fact that his loss was occasioned by the decline in value (or perhaps the original worthlessness) of stock of a corporation does not affect the individual nature of his action*, since his complaint is not that the defendants removed assets from the corporation but that they induced him to invest in it in the first place.

MARSH'S CALIFORNIA CORPORATE LAW, § 15.11 (emphasis added)

This cause of action – secondary liability for securities fraud – seeks to recover damages for the omissions of material facts or the affirmative misrepresentations of material facts made to the REL Class Plaintiffs in connection with the Exchange Offer.  This cause of action does not depend upon any explicit or implicit harm to REL and this measure of damages does not appear to compensate the REL Class Plaintiffs for injury to REL, as REL was not injured by the Exchange Offer or by its misrepresentations or omissions to its members.

But, like the Court's analysis with respect to the aiding and abetting breach of fiduciary duty claim asserted against Wells Fargo, it is theoretically possible that some component of the damages proven at trial may be derivative of damage to REL based upon its managers' post-Exchange Offer mismanagement.  To the extent that it is, that component of damage cannot be recovered by the REL Class Plaintiffs.[16]  Again, they will share in any recovery for the REL managers' post-Exchange Offer mismanagement as creditors of REL pursuant to the terms of the Plan.

---

[16] Even though under California law the REL Class Plaintiffs may recover damages based on losses not caused by the alleged misrepresentations, given REL's bankruptcy filing, this Court must analyze the issue of damages through a bankruptcy lens.  Under bankruptcy law, any claim for post-Exchange Offer mismanagement and the ensuing damages belonged to REL as of the petition date.

### v. The California Unfair Competition Law Claim

The REL Class Plaintiffs' third cause of action alleges violation of the California Unfair Competition Law ("**UCL**") in connection with the Exchange Offering. They allege that the same misconduct they rely upon to support their first two claims supports their UCL claim. They also allege that the harm for which they seek to recover is the inducement of the REL members into the Exchange Offering based on Wells Fargo's allegedly "unlawful, unfair or fraudulent" conduct. Finally, the remedy they seek is that Wells Fargo "be required to pay restitution" to the REL Class Plaintiffs. TAC ¶ 323.

The Court agrees with the REL Class Plaintiffs in part. The UCL certainly prohibits a broad range of unfair business practices. CAL. BUS. & PROF. CODE § 17200 *et seq.* However, as the California Supreme Court thoroughly discussed in *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 943 (Cal. 2003), while the UCL is expansive in scope, remedies under the UCL are limited. Because an action under the UCL is equitable in nature, a plaintiff cannot recover damages. *Id.* Instead, as the court in *Hill v. Opus Corp.*, 464 B.R. 361, 934 (C.D. Cal. 2011) held, a plaintiff is limited to injunctive relief or restitution as its remedies. *See also Cel-Tech Commc'ns*, 973 P.2d 527, 539 ("Prevailing plaintiffs are generally limited to injunctive relief and restitution. Plaintiffs may not receive damages, much less *treble* damages, or attorney fees." (citations omitted)). In *Kraus v. Trinity Mgmt. Svcs., Inc.*, 999 P.2d 718, 726-27 (Cal. 2000), the California Supreme Court defined restitution in the context of the UCL as "compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken, that is, to persons who had an ownership interest in the property." Moreover, as the California Supreme Court stated:

> The object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest . . . . The remedy sought by plaintiff in this case is not

restitutionary because plaintiff does not have an ownership interest in the money it seeks to recover from defendants.

*Korea Supply Co.*, 63 P.3d at 947.

The REL Class Plaintiffs allege that Wells Fargo engaged in business practices that violated the UCL.  Assuming, without deciding, that the REL Class Plaintiff have a cognizable cause of action under the UCL, the REL Class Plaintiffs' remedy under California law is limited to restitution, as injunctive relief is neither sought nor beneficial here.  From this Court's reading of California law, restitution would permit the recovery of the money or property allegedly taken through the unfair practice – *i.e.*, the REL Class Plaintiffs' membership interests in REL, as no money was provided at the time of the Exchange Offering.  As noted previously, that is not the remedy the REL Class Plaintiffs hope to receive; rather, they hope to compel Wells Fargo to "pay restitution."  But, like the California Supreme Court said of the plaintiffs in *Korea Supply*, this Court has grave concerns that "the remedy sought by the [REL Class Plaintiffs] in this case is not restitutionary because the [REL Class Plaintiffs do] not have an ownership interest in the money [they] seek[] to recover from [Wells Fargo].  *Id.*

Thus, while this Court has some concern over whether the REL Class Plaintiffs can prevail on this claim and recover the monies they seek to recover, that decision is better left to the court presiding over the California Class Action.  *See Seven Seas*, 522 F.3d at 585, 587-88 ("[W]hether the claim[] will ultimately prove to be legally or factually valid is not [the court's] concern. . . . [T]he fact that [a party] ultimately may be unable to prevail on the claims does not render the claims property of the estate.").  All this Court should do is analyze Wells Fargo's legal contention that some portion of the damages sought with respect to this claim are derivative of harm to REL; and thus, the REL Class Plaintiffs should be enjoined from pursuing the recovery of those damages.  And, after doing so, this Court disagrees with Wells Fargo.  The

only remedy available to the REL Class Plaintiffs is restitution, not damages.  Thus, the REL Class Plaintiffs simply cannot seek to recover damages on the UCL claim that compensate them for the REL managers' post-Exchange Offer mismanagement of REL.

## III.    CONCLUSION

The REL Class Plaintiffs complied with the Opinion when they amended the California Class Action complaint.  The TAC does not state a claim against Wells Fargo that is property of the REL bankruptcy estate.  The three claims pled in the TAC state claims that belong to the REL Class Plaintiffs.  However, because it is theoretically possible that some component of the damages proven at trial may be derivative of damage to REL based upon its managers' post-Exchange Offer mismanagement, the Court will issue an injunction preventing the REL Class Plaintiffs from collecting that portion of the damages proven at trial.  We leave it to the court presiding over the California Class Action to correctly apportion those damages to the extent that becomes necessary at trial.

An Order granting the Motion to this limited extent and a conforming Judgment will be entered separately.  Counsel for the REL Class Plaintiffs is directed to prepare such documents, get Wells Fargo's approval as to the form of the documents, and then upload them for the Court's consideration within ten (10) days of the entry of this Memorandum Opinion on the Court's docket.  If no agreement can be reached, the parties are directed to submit their respective proposed forms of documents to the Court for consideration by the Court within that same ten (10) day time period.

### END OF MEMORANDUM OPINION ###